ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- | ) |
| | ) |
| AISG, Inc. | ) ASBCA Nos. 58696, 59151 |
| | ) |
| Under Contract No. W5J9JE-10-C-0039 | ) |

APPEARANCES FOR THE APPELLANT:    Karl Dix, Jr., Esq.
J. Daniel Puckett, Esq.
Steven J. Stuart, Esq.
  Smith Currie & Hancock LLP
  Atlanta, GA

APPEARANCES FOR THE GOVERNMENT:    Thomas H. Gourlay, Jr., Esq.
  Engineer Chief Trial Attorney
James A. Wallace, Esq.
Daniel B. McConnell, Esq.
  Engineer Trial Attorneys
  U.S. Army Engineer District, Middle East
  Winchester, VA

## OPINION BY ADMINISTRATIVE JUDGE DICKINSON
## ON APPELLANT'S SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT

This appeal[1] arises under a contract awarded by the Corps of Engineers (government) to AISG, Inc. (AISG or appellant), for the construction of a secure walled police station in Sar Hawza, Paktika Province, Afghanistan. Appellant has moved for summary judgment, arguing that there are no material facts in dispute and that it is entitled, as a matter of law, to an equitable adjustment for additional costs in the amount of $841,243.39 incurred as a result of the government's alleged failure to provide an appropriate building site for construction of the police station. The government opposes the motion. The record before us on the motion consists of the Rule 4 file and exhibits to the parties' filings on the motion.

---

[1] This appeal is from a deemed denial (SOF ¶ 30). Appellant's initial motion for summary judgement was filed prior to receipt of a contracting officer's final decision (COFD). After receipt of a COFD, appellant requested and, without objection, was granted permission to file this supplemental motion for summary judgement which replaces the original motion.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1. Firm-fixed-price Contract No. W5J9JE-10-C-0039 was awarded by the government to AISG on 3 September 2010 in the amount of $2,148,243 for the construction of a one-story police station in Sar Hawza, Paktika Province, Afghanistan, and $52,000 for demolition of some existing structures. The period of performance was 365 days plus 65 weather days for a total of 430 days. (R4, tab 2 at 3) AISG was required to commence work under the contract within 10 days after issuance of the Notice to Proceed (*id.* at 10).

2. The contract incorporated by reference Federal Acquisition Regulation (FAR) 52.233-1, DISPUTES (JUL 2002); FAR 52.236-2, DIFFERING SITE CONDITIONS (APR 1984); and FAR 52.243-4, CHANGES (JUN 2007) (R4, tab 2 at 8-9).

3. The record before us on the motion does not contain the Statement of Work (SOW) or more than a very few isolated pages of the contract specifications, either as originally awarded or as modified. It is undisputed that the site upon which the police station was to be constructed was to be provided by the government and that AISG was to adapt the provided site to meet the contract requirements (R4, tabs 4, 7, 12, 14-16, 19, 34, 37, 57; SOF ¶ 17).

4. It is also undisputed that, after award of the contract, it was discovered that the adjacent coalition forces installation had encroached on the planned building site (Location #1) (R4, tab 19, *see also* tab 35). By letter dated 5 November 2010 the government issued a suspension of work notice, citing FAR 52.242-14.

> You are also hereby restricted from incurring any
> additional cost against this portion of the contract. It is the
> intention of the U.S. Army Corps of Engineers to follow
> up this letter with additional technical direction concerning
> this project site. The Suspension of Work will end upon
> written notice from the Contracting Officer or
> Administrative Contracting Officer.

(R4, tab 11, *see also* tab 35) The notice was acknowledged in writing by AISG.

5. In a 5 March 2011 Site Investigation Report, Corps project engineer Sokoloski stated that the "local Sub Governor" had requested that the site for the police station "should be located at the hill location closer to the village" and included the coordinates for the hill location as well as photos of the site. This location is hereinafter referred to as Location #2. The 5 March 2011 Site Investigation Report stated:

2

5. Benefits of moving ANP HQ to site location on top of hill:

    5.1 Site is preferred by local officials and US Army.
    5.2 Site is closer to village of Sar Hawza and will most likely improve security for citizens.
    5.3 The site has little to no obstructions for construction activities.
    5.4 Construction activities can begin as soon as new site assessment is completed.

6. Potential cost of moving site to hill location:

    6.1 Cost of bring [sic] materials up the hill, the road is not level and erodes rapidly during heavy rain and snow.
    6.2 Possible time lost when road is not passable for materials and supplies.

7. The proposed new site location appears to be an acceptable location if water is readily available at the site. The presence of water in the nearby area seems [to] be an indication that water could be found on the proposed site. The project could move forward if this site is chosen and the site assessment is completed in a timely manner. Project Engineer recommends relocating the site to hill location if site assessment agrees that no adverse land ownership issues are present and water can be expected at site location.

(R4, tab 14 at 3-4, *see also* tab 19)

    6. The 28 May 2011 Site Assessment Report, prepared for the government by JQ Builders, states in pertinent part:

### 1. INTRODUCTION

JQ [B]uilders have completed Site Assessment of approximately 6400[]sqm parcel land for **SAR HAWZA UP DHQ** facility in SAR HAWZA District, Pakti[k]a Province Afghanistan, for the Ministry of Interior (MoI). The site is located at the District Center; currently there is an ANP police post at the center of the proposed site.

3

The site visit was conducted at the end of April 2011 for the Uniform Police District Headquarter (UP DHQ)

This effort was preliminary to a Master Planning effort including assessment of the following

1. Land Ownership
2. Adjacent Land Use
3. General Availability of Utilities on Site
4. Site Condition
5. Access Roads
6. Availability of Construction Materials and Labor
7. Availability [of] Clinics, Fuel and Public Transportation

....

## 3.2. Site Ownership

The proposed site is Government property belongs to MoI according Government officials, Land Documents are signed by the following Government officials.

Government officials and Coalition forces officials at the region proved that the proposed land is Government property and MoI should proceed for construction at the same site.

1. Verified and signed by – MoI facility Department Director
2. Verified and signed by – CPT Dale Marrou
3. Verified and signed by – Deputy Provincial Governor – Haji Mohamad Zadran
4. Verified and signed by – Sub-Governor – Haji Khan
5. Verified and signed by – District Police Commander – Abdul Wahid Kandari
6. Verified and signed by – Provincial Police Chief – Daulat Khan
7. Verified and signed by – Zone Commander – "Gul Nabi" Ahmad Zai
8. Verified and signed by – Member of Agriculture Department – Mir Zajan
9. Verified and signed by – Member of Amlam Department – Mr. Agha Mohammad

4

10. Verified and signed by – Director of Agriculture: Hamidulluah

***JQ team has verified the Land from every aspect and signed by all possible government officials and local elders.***

....

**3.8** ...Over all security situation is bad at the region.

(R4, tab 15)  The Site Assessment Report includes 20 pages of copies of "GOVERNMENT LETTERS & LAND OWNER SHIP CERTIFICATES" (R4, tab 15 at 5-24), as well as various photos of the site.

7. In a report prepared by Corps project engineer Blackwell regarding a 19-20 June 2011 site visit, it was noted that in an informal meeting the "Sub-governor ...confirmed his support for the new location." He further reported that there was a productive well to provide potable water and that the site was "preferred by both local officials" and the government. (R4, tab 16 at 1, 4)

> **Other Comments:** It would be smart to have Ktr begin the perimeter wall as soon as he can get mobilized & to build this with 'village' labor. This is an opportunity to show locals that project will provide jobs & Ktr will spend money locally. Also, since winter will impact road access, this wall/fence is a part of SOW that is simple enough to complete with minimum of 'out-of-village' material/expertise. It will have immediate value to the existing ANP outpost.

(*Id.* at 4)

8. By letter dated 17 July 2011 the government lifted the suspension of work and gave AISG the opportunity to submit a "proposal for impacts associated with this 252 calendar day suspension of work" (RFP No. 1) (R4, tab 18, *see also* tab 19). AISG's proposal was received by the government on 9 August 2011 (R4, tab 48).

9. Bilateral contract Modification No. P00002 dated 6 October 2011 extended the contract performance period by 252 calendar days and provided additional compensation in the amount of $209,000 for "[a]ll added costs associated with relocation of contractual scope of work to property described by Plat A-1, dated 11 June 2011." The change in contract specifications was described as:

> Specification Section N/A Drawing A-1 dated 11 June
> 2011 will replace original property description in contract.
> The change in location does not change design 'templates'
> nor specification 'templates' that are provided in this
> contract's technical provisions and other contract
> documents. It is the design-build contractor's
> responsibility to provide all necessary documents for site
> adaptation of this contractual scope of work.

(R4, tab 4) The updated specification section is not in the record before us on the motion, but the referenced "Drawing R E Plat Plat A-1" (R4, tab 4 at 2), may be found at several locations in the record (*see, e.g.,* R4, tab 17 at 3). The modification made 17 July 2011 the new contractual completion date (R4, tab 4 at 2).

10. Contract Modifications Nos. P00003-00004, dated 25 October 2011 and 16 January 2012, respectively, and issued for reasons not now at issue, further extended the contract completion date to 18 December 2012 (R4, tabs 5, 6).

11. Unilateral Contract Modification No. P00005 dated 21 February 2012 provided additional compensation in the amount of $7,334 "to settle a request for equitable adjustment (REA) due to 252-day suspension of work" which was "necessary while USACE acquired a new property for site to perform the SOW" (R4, tab 7, *see also* tab 35). The modification did not further extend the contract performance period and included the following language:

> [T]he contract price is increased as stated above, which
> reflects all credits due the Government and all debits due
> the Contractor. It is further understood and agreed that this
> adjustment constitutes compensation in full on behalf of
> the Contractor and its Subcontractors and Suppliers for all
> costs and markups directly or indirectly attributable for the
> change ordered, for all delays related thereto, for all
> extended overhead costs, and for performance of the
> change within the time frame stated.

(R4, tab 7 at 2)

12. From at least 8 February 2012 through 27 April 2012 the parties engaged in discussion via correspondence and otherwise on the subject of the contractual submittal requirements (R4, tabs 22-29, 35).

13. In a 5 May 2012 phone conversation, AISG requested that the government terminate the contract for convenience (R4, tab 35 at 2).

14. By 8 May 2012 AISG had mobilized to the jobsite and had begun work even though the government advised that AISG had not yet complied with the contractual pre-construction submittal requirements. The government issued a letter of concern in which it listed eight (8) required pre-construction submittals, only one of which had been approved and the government directed AISG to "cease any and all on-going works on the project site until such time as you have met your contractual obligations and have received clearance from the USACE to mobilize." (R4, tab 30, *see also* tabs 31, 35) Thereafter, the parties continued to engage on the subject of pre-construction submittals (R4, tabs 32-33).

15. On 19 May 2012 AISG submitted Request for Information (RFI) No. 1 to the government requesting that the project site be moved to a different, third set of coordinates (hereinafter Location #3) that it alleged was "supported by the local government & Police Commander" (R4, tab 34, *see also* tabs 35, 51 (attach. 3)). In a 22 May 2012 Memorandum for Record, the government's project manager Jenkins stated:

> To date, the Government has issued four (4) modifications to subject contract while the placement is still at zero percent (0%). At no point during this project, either at the original site [Location #1] or at the new site [Location #2], has the contractor performed any work. These pre-construction modifications have increased the contract price from the original amount of $2,222,187.00 to $3,223,231.83, which is an increase of 45%. This causes me to question whether or not this is outside of the scope.
>
> There is currently no schedule for this project. We have not received any more pre-construction submittals, and nothing on the Government's side has stopped the contractor from fulfilling this obligation. The Resident Office, the Area Office, the Project Manager, the Customer (NTM-A), and COL Martin have all agreed that this project needs to be terminated. As I stated before, the current contract with modifications is already 45% above the original contract amount and we have had no progress. Based on the above stated facts, we need to seriously consider terminating this contract. If we continue to try to force this contract to work, we can easily spend much more money in the process. My recommendation would be to terminate the project, as the Government requirements

7

have changed significantly and the Contractor has not performed.

(R4, tab 35 at 2)

16. AISG claims government project engineer Riles approved Location #3 sometime prior to 18 April 2012 (R4, tab 54 at 2). This is a proposed finding of fact that is central and material to the matter now before us and the record shows that the proposed fact is in dispute (R4, tab 55; app. mot, ex. A at 6-11; gov't opp'n, Riles decl.; SOF ¶¶ 6, 7, 16)

17. By letter dated 4 June 2012 AISG provided information that it considered to complete all required pre-construction submittals (R4, tab 36, *see also* tabs 39-41). AISG's position is that, because this was a site-adapt project, submittals could not be prepared until the location of the site was finalized (app. mot., ex. A).

18. On 25 July 2012 the Afghanistan Ministry of Interior "Authorize[d]" the government to have AISG construct the Sar Hawza project at Location #3 (R4, tab 51, attach. 3 at 31).

19. On 6 August 2012 the government issued a Cure Notice to AISG:

> This Cure Notice constitutes final notice to your company on your continued failure to meet contract requirements. Specifically you have failed to provide acceptable contract required preconstruction submittals, to include the Accident Prevention Plan, a Work Plan, a QC Plan, and a Construction Schedule. This project was awarded on 3 September 2010. The project was suspended on 5 November 2010, and the suspension was lifted on 17 July 2011. Subsequently, there was a modification signed on 20 October 2011 to move the location of the project. To date, your company has failed to submit the submittals required by your contract. You have far exceeded any reasonable time frame to begin providing the required submittals.
>
> Your company is now 684 days into the contract and you have yet to make any significant progress during the past 12 months toward completion. The contract required completion date is 19 August 2012[2]. Since there

---

2 The correct completion date is 18 December 2012 (SOF ¶ 10).

8

are now less than 32 days remaining in your contract, it no longer appears possible to complete this contract within the allotted period of performance.

AISG has not had authorization to mobilize to the site, nor has AISG completed any acceptable work to date. Serial Letter C-0005 was issued on 8 February 2012…to address the lack of progress on AISG's part. Serial Letter C-0009…was issued on 8 May 2012 to address the fact that AISG had begun mobilizing to the project site without the required pre-construction submittals in place. Also on 8 May 2012, Serial Letter C-0010…was issued to notify you that AISG would be receiving an interim unsatisfactory rating which is accessible in CCASS…. In spite of repeated Government requests, you have failed to provide all required submittals. The latest correspondence on this issue was an email sent by Mr. Jonathan Jenkins on 7 July 2012…and answered a question on how to properly submit submittals. As of today's date, those submittals in question have still not been properly submitted. It has been obvious from the start of this project that your company lacks the knowledge and experience required to understand the basic contract requirements needed to complete this project.

(R4, tab 42)

20. In AISG's 16 August 2012 response to the Cure Notice, it stated that all pre-construction submittals had been provided with the exception of the Construction Schedule which it stated was provided with the letter. With respect to AISG's RFI requesting a change to Location #3, AISG stated:

The current RFI to reconsider the Site Location is awaiting a letter from the Afghanistan Ministry of Interior. However, if the USACE does not want to reconsider, then AISG is prepared to move immediately onto site "A" and site-adapt the ANP headquarters. AISG was endeavoring to placate and satisfy the Afghan Village Elders, Local Police and Provisional Government to avoid local Afghan protests which have occurred in such sites as Khair Kot in Sharana, Paktika…. Obviously, the local customers could severely disrupt the construction if they do not support the Corps and the Project. The final attachment is a letter from

9

the Afghanistan Ministry of Interior which states they want us to build on the site identified by the Local Village Elders in Sar Hawza, the Local Police and the Provisional Government. *This RFI was submitted on 15 July 2012. We are still waiting for a response.*

AISG will construct wherever USACE directs, regardless of the requests of the Sar Hawza Village Elders, Local Police, District Government or the Afghanistan Ministry of Interior's requests. The local interests are properly concerned that the current location provided by the USACE is too close to the village, and does not provide the proper standoff thereby compromising the safety of both the Police Headquarters and the village. If the USACE believes that building the Police Headquarters within 10 meters from the village is the correct decision, then AISG will begin construction despite the local concerns.

The Cure Notice states the completion date for the contract is 19 August 2012.... Therefore, we respectfully request that you rescind the Cure Notice since it was not based on accurate information. We remain committed to timely completing this Project for the Corps.

(R4, tab 44)

21. On 21 August 2012 the government formally denied AISG's request to change the project site to Location #3 (R4, tab 43).

22. On 29 August 2012 AISG again submitted an RFI requesting that the project site be changed to Location #3, stating:

If AISG use[s] the coordinates given by USACE, there is a risk of incurring unnecessary resentment from the Village Elder's [sic], Local Police, District Governor, and the Ministry of Interior.

(R4, tab 45)

23. On 3 October 2012 the government requested that AISG submit a proposal to relocate the contract work to Location #3 (R4, tab 46). AISG's undated proposal requested no increase in contract price and a new contract completion date of

21 October 2013 (R4, tab 47). By letter dated 5 November 2012, contracting officer LaRosa cancelled the government's request for a proposal and directed AISG to proceed to perform the contract work at Location #2:

> AISG was well aware of the "obstructions", an ANP outpost and an encroachment into an adjacent village wall, that were within the above noted "Plat A-1" coordinates.
>
> [AISG's proposal to perform the work at Location #2 was received by the government on 9 August 2011.]
>
> In regards to the ANP Outpost, AISG states [in its Location #2 proposal]: *"The ANP outpost will be disassembled to allow for reassembly, if desired at a future date. The most expedient method of removal would be the demolition of the outpost; however, this would destroy the Hesco and eliminate the possibility of reusing the materials. Disassembly to preserve the material will be manpower intensive, with the individual Hesco units being emptied by hand."*
>
> In regards to the encroachment on the village wall, AISG states [in its Location #2 proposal]: *"The village wall to the right in the photo will require removal. Once the sections are removed, we recommend tying in the remaining walls to the perimeter wall of the site as a cost savings. To minimize the loss of security for the residents, we will begin construction of that portion of the perimeter wall first."*
>
> ...Construction will continue with the [Location #2] coordinates, the original contract documents, and all exercised modifications to date.

(R4, tab 48 at 2, *see also* tab 51, attach. 1 at 37-39)

24. On 13 November 2012 the government issued a Show Cause Letter in which it again stated that AISG, in its August 2011 proposal to perform the contract work at Location #2, was aware "of the existing ANP checkpoint, and the site encroachment into the existing village" (R4, tab 50 at 3). Further:

> In your RFP No. 1 Technical & Cost Proposal you indicate that the content of your proposal is primarily based upon

11

your 25 July 2011 site visit of the new site location. In your RFP No. 1 proposal you explain how you are going to address the ANP checkpoint and the site encroachment and then 299 days later you submit RFI No. 001 presenting the obstructions as if it was the first time you became aware of them. This action amounts to gross failure by you to prosecute the work with the diligence that will insure its completion within the time specified in the contract.

(*Id.* at 4)

25. In its 18 November 2012 response to the Show Cause Letter, AISG for the first time claimed that AISG's failure to progress with the work was due to delays resulting from the government's alleged failure to procure "approval of the local Village Elders, Afghan National Police ('ANP') and Afghan Ministry of the Interior" and further stated that "Afghan authorities absolutely refuse to move" the existing police checkpoint. (R4, tab 51 at 1-2, *see also* app. mot., ex. A)

26. On 13 December 2012 the government issued a suspension of all work, including procurement, design and administrative actions associated with the project (R4, tabs 52, 54-55). The suspension of work was lifted effective 18 December 2012 and referenced "attached documents and Photos and coordinates for the approved finalized work site" which are not contained in the record with the letter (R4, tab 53), but we find from the rest of the record that the subject of the referenced attachments was the approval by the government of Location #3 as the construction site (*see, e.g.,* R4, tab 54).

27. On 28 January 2013 AISG thanked the government for finalizing the project site location and submitted a request for equitable adjustment (REA) under the Changes clause seeking $1,019,077.39 on the sole basis of alleged site location delays from May–December 2012 (R4, tab 54).

28. Contract Modification No. P00007[3] dated 29 January 2013 relocated the building site to Location #3, provided no additional compensation and extended the contract completion date by 393 calendar days to 15 January 2014. The modification directed AISG to change the contract drawings to incorporate the new grid coordinates and to show all changes on the contract as-built drawings. (R4, tab 9, *see also* tab 49)

---

[3] The modification states that the contractor was required to sign the document, however, the copy in the record before us shows only the contracting officer's signature.

29. By letter dated 14 March 2013 the government denied AISG's REA except for the amount of $1,490.32 and an extension of 5 days due to the December 2012 suspension of work. On 2 April 2013 AISG converted its REA to a certified claim and requested a contracting officer's final decision. (R4, tabs 55-56)

30. On 12 June 2013, after receiving no response from the government to its certified claim, AISG appealed to this Board from a deemed denial. This appeal was docketed as ASBCA No. 58696. AISG's complaint seeks $841,243.39 for alleged site location delays, citing the Changes clause, Differing Site Conditions clause and breach of the implied duty of good faith and fair dealing. A subsequent contracting officer's final decision denying the claim is dated 8 February 2014. The timely appeal of the COFD was docketed as ASBCA No. 59151 and consolidated with ASBCA No. 58696.

## DECISION

Appellant's claim from which this appeal arises seeks compensation for delays allegedly resulting from failure of the government to provide an appropriate building site (SOF ¶¶ 27, 29, 30) Appellant asserts several legal theories in support of its claim (defective specification as to Location #2; lack of evidence that the government obtained necessary approvals for Location #2; delay associated with approval, retraction and subsequent re-approval of third building site; and, breach of the implied duty of good faith and fair dealing) (app. mot. at 23-31, 34, 43). AISG described the factual heart of the claim and appeal as "the Corps' failure to provide AISG with a Project site to construct the ANP Headquarters" (app. reply at 2).

Our review of the record before us on the motion reveals that it requires further development as it is virtually devoid of evidence of the SOW and specifications from which we can determine certain contractual rights and obligations of the parties as they relate to AISG's motion (SOF ¶ 3). The evidence that is in the existing record before us on the motion contains multiple material facts in dispute. Among the material facts that are in dispute or for which there is no evidence (as opposed to bare argument) presented by either party are (1) what the contract requires the government to provide as a project site (SOF ¶ 3), (2) whether Location #2 met the contract requirements as the site for construction (SOF ¶¶ 16, 20, 27-28), (3) what, if any, approvals the government was required by the contract or otherwise to obtain before construction could begin at any site (SOF ¶¶ 5-7, 18), and (4) whether the government first approved Location #3 as the building site sometime prior to May 2012 (SOF ¶¶ 13, 23-24).

13

On the basis of the foregoing, appellant's motion for summary judgment is denied.

Dated: 23 September 2015

DIANA S. DICKINSON
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 58696 and 59151, Appeals of AISG, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

14